Good morning and may it please the court. My name is Graham Bryant and together with Jordan Monat, Assistant Solicitor General for Virginia, I represent Harold Clarke, Felicia Stretcher, and Richard Davis in this inauguratory appeal in the district court's decision denying qualified immunity. The district, I'd like to reserve five minutes for rebuttal as well. The district court misapplied the circuit's precedent for determining whether the law was clearly established for and in doing so it alighted the hard part of the case and it got the qualified immunity analysis backwards. It concluded based on the absence of evidence that or the absence of precedent rather that the government lacked a sufficient interest in testing Garrett. This was error. I plan to focus my time today on showing how the district court misapplied the clearly established analysis. Under a proper analysis, no controlling or persuasive precedent placed the appellant's own notice that applying the random drug testing policy to Mr. Garrett violated. In focusing on a clearly established business under Pearson v Callahan, we can do either the merits or the clearly established. I'm sort of surprised that you wouldn't just go after the established. Absolutely, your honor. You're not giving up your argument on the merits, are you? Certainly not, your honor. We believe firmly that we would prevail on the merits or under clearly established. Can you, before you turn to the clearly established part, can you talk to me a little bit about what I do with the consent and the employment agreement? I mean, there seem to be like a little bit of divergence across the courts on the degree to which the consent matters, ranging from it sort of resolves the case in your favor to it sort of doesn't matter. Can you talk to me about what that means for your analysis? The primary role of Mr. Garrett being fully aware through policy 135.4 that he was subject to random was complete or otherwise refused testing. He could be terminated. That dramatically reduced his expectation of privacy in this context. Okay. And so when you say the policy, what is that something he agreed to, or is that something that was imposed on him? Did he sign something when he became an employee that acknowledged he was subject to drug testing? Yes, your honor. He signed the document acknowledging that he had received interviewed the policy and consented to it. It's not really that there's a policy, it's that he agreed to it. Oh, absolutely, your honor. But your point is that it's only pertinent in evaluating the degree of his expectation, not that it's like we think about in other contexts. When someone consents to something, it doesn't change their expectations. It just means that there's consent, right? If somebody walks up to my door and asked to search my house, when I consent, it's not that expectations have changed. I've just consented. I have no fourth amendment claim once they walk in my house, as long as they are accurate in the scope of that consent. Of course. So why are you not arguing that that suffices here, that consent just simply resolves it? Well, the consent honestly could resolve it, your honor. No, but you haven't argued that, and I'm curious why. Under the CATS framework, everyone always has a fourth amendment expectation or a fourth amendment expectation. Under the circumstances in that person's specific factual situation, reviewed in the totality of the evidence, that interest will always remain, but the expectation of it can get lower and lower and vanish. And the consent here, by consenting to it, Mr. Garrett did functionally give away his expectation of privacy. He opened up his fourth amendment privacy interest to the search that would have taken place here had he remained. So yes, we believe that by consenting to the test or by consenting to the policy, he functionally waived any privacy interest he would have. So on the fourth amendment balancing test, there's next to nothing on Garrett's privacy interest side. So let me ask maybe the same question. Do you think that if I had a purely administrative person, so imagine one of my law clerks in the back, right? And I make them sign a piece of paper and I said, no, in order to work for me, you have to agree to random drug testing. And even though I think under Skinner and Von Raub, they're not the type of people for which there's a special need. If they've consented to it, is that okay? I believe consent should be enough. And certainly in this case, there's the confluence of factors that are all coalescing into just a melange of special needs that surround Mr. Garrett. In addition to being a access to maintain the information technology and network infrastructure of the department of corrections, he also, by his own admissions in the complaint, he is affirmatively alleging that he has contact with inmates both at headquarters and when he's out on the field. So collectively at any point in which Mr. Garrett is doing his job, he has contact with inmates. What it was you suggested, and then I'll stop and I'll let others, but you suggested there is access. I get the part of inmates, but the access to confidential information, that that itself is a special need. What's the best case that you've got for that suggestion? It is. The Von Raub case obviously did not fully decide the issue. It acknowledged that it needed to remand for additional facts on that. But then there's other case law, including from the DC circuit that has held that at the core of special needs, at least is top secret confidential information. So just looking at those two cases, there's kind of a range of information that could be considered sensitive information as a privacy or as a special need. And our view certainly is that nothing in the case law would have put the defendants here on notice that access to the information technology backbone of the department of corrections, contact information for correctional employees, but that would not be a sufficient. As you know, Mr. Bryan, apart from the, I agree that the consent is relevant here, and I think it certainly weighs on your side. But it seems to me the larger point is that the prison environment itself establishes a special need for drug testing. And there have been innumerable circuit decisions that have upheld drug testing programs on that basis. And what happens is this, these drugs are the most, they pose the most clear and present danger to order within the prison environment. Because what happens here is you get a good number of inmates, many of whom are incarcerated for drug-related offenses, and they recreate within the prison environment, the same environment that they were operating in on the streets. They learn the tricks of the trade on the streets, they learn how to operate, they learn how to establish their turf. They learn how to coalesce into groups and gangs. And then they transfer all of that knowledge into the prison environment and recreate it with all of the tricks of the trade and what else. And it poses, on balance, a really significant threat to prison order and discipline. And to sort of tie the prison's hand on combating what is the major problem within that environment is just almost to encourage a degree of lawlessness above and apart from what is already there. Absolutely, Your Honor. That is certainly our position. And I think the facts that you just mentioned about how the correctional environment in some ways comes to replicate the streets, so to speak, that also speaks to why so many of the cases describe the risk of drug smuggling arising from the mere contact with inmates. So even if Mr. Garrett does spend most of his time at headquarters, he's alleged there are prisoners that are there at headquarters. By developing relationships with these prisoners, or any type of situation that could expose him to compromise the security of the Department of Corrections, either through blackmail, friendship, what have you, anything that could lead him to compromise on those principles is a severe danger to the Department of Corrections and that department's mission. That's why this policy is here. Before you get too far down the road on these various factors, I wanted to just circle back to consent and give you a chance to respond to what I think will be your opponent's argument about courts who have said that you They cite an Eighth Circuit case for that. So what's your response to that here, that the consent doesn't count for as much as you claim because you can't require someone to consent to an unconstitutional search? Our response would be that the search is not unconstitutional. Right, so the two are tied together. One, the consent doesn't stand by itself. It depends on your argument that this is constitutional. I believe to a certain degree it would have to. I think, again, the consent's effect, if it does not outright eliminate the Fourth Amendment problem, what it does do is ensure that Mr. Garrett's privacy expectation is so minimal that the substantial interest that the Department of Corrections has on the other side of the balance, all of the special needs from sensitivity to contact with prisoners, the safety-sensitive interests, all of those that we've outlined in our briefing and on argument far outweigh the expectation of privacy on the other side of the balance, such that the consent, to the extent it does work, means that there really is no violation. Well, it's bound to have some relevance. It may not be conclusive in itself, but it's bound to have some relevance simply from the fact that innumerable car searches, for example, are allowed under a theory of whether the consent was voluntary under the totality of the circumstances. Now, it may not be an exact analogy to the prison, but surely informing someone and asking their consent is better than not informing them, even though it may not be conclusive by itself. Surely letting someone know what the terms and conditions of employment are is better than keeping them in the dark. That is correct. Mr. Garrett voluntarily chose to seek employment and received employment in a highly regulated field. Corrections are perhaps the most highly regulated field known to the law. It's a place where if you go to visit a prison, even not being a prison employee, by parking in the prison parking lot, you generally are consenting to a search of your car. Those expectations are substantially lower in the context of corrections. And that's why the district court's decision that the law was not clearly established is error. No case, certainly no controlling case, says that the policy as applied to Mr. Garrett was unconstitutional or would have even begun to put the individual defendants on notice of that. But if we go on the clearly established business, you know there's some problems with deciding cases on a clearly established basis because the prison system, the correction system, has an interest in knowing whether these random drug searches are legitimate or whether they're not. And if we sort of weasel out and say, well, it wasn't clearly established, but it might be some point in the future, you know, you've probably, you know, you've gotten a winning case, you've gotten the result you wanted in a particular case, but you still left the prison system and the corrections department in a state of complete uncertainty. You see what I'm saying? Go for the merits. And we firmly believe that this is a case where the Department of Corrections does prevail on the merits. Our point is, at an absolute minimum, the individual defendants here should not be subject to individual financial liability for applying a policy that seemed constitutional. That's right, but that's your fallback. That's your fallback. And you don't want to think about a fallback position is you don't want to fall in the first place. Of course. And in this case, again, the test was constitutional because it was minimally invasive. A butyl swab is the least minimal or the least invasive way of doing these tests that the law has established. It's certainly less invasive than a urinalysis or a blood draw. And it's random. The cases have held that random testing is more effective at accomplishing the purpose of the test than a scheduled test that might be predicted. The special needs we've discussed, they are overwhelming in this context as concentrated in Mr. Garrett. And his privacy interest is minimal. Given those reasons, there was no Fourth Amendment violation here, and certainly qualified immunity at a minimum should apply. But again, our position is there was no violation of the Fourth Amendment. Unless the court has any other questions, I'll reserve my remaining time for rebuttal. All right. We thank you. And Mr. Allen, we'd be pleased to hear from you. May it please the court, my name is Robert Allen. I represent the grievant, or the epilee in this case, Jacobi Garrett. I'd like to first address some of the issues that were raised in the argument. As to consent, the McDowell v. Hunter case from the Eighth Circuit holds that if a search is unreasonable, an employer cannot require an employee to consent to that search as a condition of employment. So, all right, but why? I understand the Eighth Circuit, or the Tenth Circuit, whichever one, said that you cannot condition employment on a drug test, right? And I frankly have a little hard time understanding that. I understand, but I believe Judge Wilkinson's point was, you got to evaluate whether the consent is voluntary. And maybe there's some scenario where it's so coercive that it's not voluntary. You already work there, for example, right? But if it's done before you accept employment and you're aware, we don't typically think of those as being involuntary or coercive consent, right? And no more than we consider, you know, the consent or agreement to plead guilty is the waiver of your rights to a jury trial to be involuntary because it carries prison one way or the other. Right? So, what I don't understand is why you can't consent in the employment context. Is it like a constitutional right to be a government employee? Or why is it that you can't consent to Fourth Amendment searches? That's what the law from the Eighth Circuit holds. All right. And you understand that doesn't control us, right? Certainly. Now, when you talk about consent in terms of the search of a vehicle or something like that, that's a different scenario because you might have reasonable suspicion, you might have probable cause. In this case, we need to consent. But you get consent when you have neither of those, right? That's why you ask for consent. If you're an officer and you say, can I look in your car? One of the reasons to ask is because you might not have reasonable suspicion or probable cause, right? So, if you get consent, you don't need those. Well, in this case, there's some question as to what agreement or what drug policy was actually agreed to. It was amended around the time of this drug test. But setting all that aside, was that a contested issue below? It's in the complaint. I don't think that it's overly significant because the Department of Corrections has had a policy for many years that has required the drug test. The wording might change, but they've all required drug tests. Right. So, the policy could require a variety of drug tests. Any kind of drug test you could imagine, blood test, urine test. Of course, it could be a test that's done after an accident as part of an investigation. It could be a pre-employment drug test. My client took a pre-employment drug test and passed it. But what this case involves is a suspicionless random drug test. Well, let me ask you this. What is the problem here? One of the things that we look at is how intrusive is the search. If they were drawing blood, one thing. If this were urinalysis, maybe one thing. Certainly, if it's through a strip search, I think that would be the most humiliating of all. But the world is so invasive about a facial swab. I mean, what is the big deal? I mean, because one of the things that you look at in establishing Fourth Amendment reasonableness is the method of any kind of intrusion. And I suspect a facial swab would be the least intrusive of methods of conducting this. It's not in the record what type of test this would be. Are you disputing the fact that it was a facial swab? There was no test in this case. Under the facts of this case, my client was... Would it have been a facial swab? You don't say that it wouldn't have been. The state contends it would have been. I believe that it most likely would have been. I can't say with certainty what it would have been. All right. Well, let's say, okay, you believe it most likely would have been, and I appreciate your candor. But why? I mean, what is the, just to put it in the vernacular, what is the deal when we're doing a facial swab? I mean, if they were doing a blood test or whatever, the Supreme Court is actually in Schmerber allowed more invasive kind of things. But it seems to me here, the Department of Corrections has a policy that requires drug testing of every employee, regardless of what they do, regardless of their duties, regardless of whether they're involved in this. That's fine. And if it were selective, you would have a problem there. And you would say, well, they were treating people unequally. So what Departments of Correction have done is they've gone into random tests that don't run the risk of racial profiling or some sort of profiling. If they apply it to everyone, that's the most even-handed thing they can come up with, isn't it? Well, again, I disagree. I think it's the most unconstitutional way to approach it. In this, if you look at the Taylor case from the Seventh Circuit, very similar facts, dealing with Department of Corrections employees. And the court held that the only employees that could be tested are those in safety-sensitive positions. The Department of Corrections in this state requires testing of everyone. The other people that were tested along with, were selected for random testing along with Mr. Garrett, there was a personnel assistant, and a construction assistant, HR personnel. None of these people have any safety-sensitive role whatsoever. Well, let me ask you about that comment that you just made. You say none of these people had any safety-sensitive role. Are we then to take this policy and go job by job by job and say, well, this one can be tested, but that one can't be, or this job involves a greater degree of contact with inmates than that job. And if we go job by job by job, which, I mean, in many instances, facts, specificity, and narrow rulings are very, very helpful. But in some, they have real pitfalls. And what I concerned about here is that by going individual job by individual job and asking what the characteristics of each and every job are, one of the things that we have done is you get into micromanaging. And it's the job of the prison administration to decide which jobs do and which jobs don't. And if we start saying this job qualifies for random drug testing, that job fails to qualify for random drug testing. Then we've become prison micromanagers, haven't we? Well, Your Honor, you do have to go into that analysis of what the person does, whether their job is safety-sensitive. However, I do not think that would be that difficult to draw the line. For example, certain state employees are designated as classified. Certain ones are designated as safety-sensitive. But all of those judgments would be subject to litigation if we went this route, that the safety-sensitive determination in this particular instance was unwarranted. We just opened the door to litigation. Well, I think there's some bright lines and other courts have drawn the bright line for within the corrections industry, the employees that can be subjected to random drug testing are employees like prison guards, those that carry firearms, those that are involved in drug interdiction, those that are supervising or transporting the inmates. Those are safety-sensitive positions within the- But you've just drawn up a prison administration code. We'd have to go job by job. That strikes me, we're sort of drafting a code or a set of rules. Well, the code or set of rules that you're referring to really already exists. Each one of the employees that works for the state has an employee work profile that sets forth the responsibilities are. In this case, Mr. Garrett had a checklist of programs that he was able to have access to. Chorus was one of them. It's an inmate management system. The only program that Mr. Garrett had access to was Outlook and Excel. Those are basic programs. He simply was not involved in supervising or detaining transporting inmates. He didn't carry a firearm. He didn't even- On the other hand, you can point to that and they can point to the fact that he has a state car and he has contact information and he does circulate with some of the inmates at headquarters and everything. I'm just afraid of becoming a minute balancer in this kind of situation. Where I think the precedent of a number of circumstances in applying the special needs provision indicates that the prison provides a special need, in which case the latitude for this kind of drug testing is greater. I think the circuits have gone pretty far in trying to uphold this and not put ourselves in the position of a prison administrator. If we started quoting that language, it's in dozens and dozens of cases. We'd be creating something of a riptide if we started undercutting the notion that a prison environment represents a special need. Well, as a matter of fact, my client really did not work in a prison environment per se. He worked at the Department of Corrections headquarters. 70% of his work was troubleshooting employees' cell phones and that's all alleged in the complaint. Now, in the appellant's brief, there's references to the use of a vehicle and other things of that nature that really aren't in the record below. Those are cited from the hearing officer's decision. Every fact finder that has looked at the facts of this case has found that Mr. Garrett could not be subjected to drug testing. That includes the hearing officer. Did he undergo physical fitness testing when he began his employment? I don't know the answer to that. But the hearing officer found that it was unconstitutional. The Office of the Employee Dispute Resolution found they didn't find any reason to upset that decision. The circuit court found that it was unconstitutional based on all these facts that were developed during the grievance and the same facts that will be developed during this case. The Court of Appeals has now, the State Court of Appeals, which I have appealed to the Virginia Supreme Court. We have a federal question before us and on the other side of things, you can pull out decisions from the 10th and the 6th and the 7th and the 8th Circuit. The cases all involve this or have circumstances, but they all involve drug testing in the correctional environment. It does seem to me that the courts have given some respect to that. I would agree with that, and I would agree that the courts that have looked at it have gone into an analysis of the employees job duties. What do they do? Certainly if Mr. Garrett was a correctional officer, we wouldn't be here. That's clearly a safety sensitive position where she could be subjected to random drug testing under established precedent. Can I go back for a second just to the context of consent? The 8th Circuit decision says that you can't condition employment Are you aware of any instance where a court has applied the other than that case that's applied to unconstitutional conditions doctrine in a Fourth Amendment context? I mean, we think about it in the First Amendment context regularly, but occasionally we see it in like the Fifth Amendment context. Maybe it's shown up in the due process text from time to time, but I can't think of an example where the unconstitutional conditions doctrine has been applied in a Fourth Amendment context. Can you think of an example that I should look at? I mean, the cases the 8th Circuit relies on are First Amendment cases, right? You know, a teacher conditioning on their speech, right? Okay, we can sort of debate what that looks like, but I can't think of one where they've done it in the Fourth Amendment context where we've extended that doctrine, whatever its pedigree, to this particular context. I can't say that I can think of a case sitting right here. I will say with the consent, I think a person can consent to a number of things, but I think you have to look at when the drug test occurs to see whether it's unconstitutional. You have to look at what type of test it was and what was his role at that time. So, when you look at the facts of this case, it was a suspicionless random drug test and he was not involved in any safety-sensitive position with the Department of Corrections. So, as for clearly the issue of when a law is clearly established, there does not need to be a case that's exactly on point. So, first you look to the highest court of the state. There's no Virginia Supreme Court case. There's no Fourth Circuit opinion that's directly on point. However, when you look at the cases that have been decided and you look at them collectively, the cases of Skinner, Von Raab, Chandler, those Supreme Court decisions established that for a random suspicionless or warrantless drug test of a government employee to be constitutional, the employee must hold a safety-sensitive position. Well, if we went there, why doesn't the access to confidential information for fellow employees and supervisors, the use of a state car and the freedom that he has to circulate from one place to another, why isn't that sensitivity? Well, I don't concede that he had access to sensitive information. The record in this case is pretty thin at this point. It's based on the allegations of the complaint. But the information that he had access to was a cell phone database. That's not necessarily personal information of employees. It's basically their work phone number. Why do you say that? It would strike me that it was private sensitive information. Well, even if it has some degree of sensitivity, it doesn't arise to the truly sensitive nature of information as in the Von Raab case. Now, in that case, the court held that even grand jury information was not truly sensitive. The information that was sensitive enough for an employee to be subject to random drug testing was information on drug interdiction plans, names of informants, things of that nature. You know, if somebody's driving around in a prison environment and they have access, they have my cell phone information, and they have my contact information, and they have my cell phone information and contact information from all the other employees or however many other employees in the prison system, that person would seem to me to be the kind of individual that have the kind of information that other inmates might be very interested in because it would increase their ability to coordinate. If you've got everybody's cell phone number, and you've got everybody's contact information, and you want to establish some kind of coordinated drug activity, having that kind of information on hand would seem to me to be very useful. Well, the extent of the information that Mr. Garrett had access to is not that well established in the record at this point. In his job description, it talks about managing a database. Again, the evidence would have to show exactly what that database is, but the information that he had access to doesn't come close to what Von Raab has described as truly sensitive information. What I'm saying is that information is power, and anybody that has information, everybody else's cell phone number and everybody else's contact information and the rest, if I were a person of some influence in the prison environment, I'd love to get my hands on it because I could make all kinds of calls to all kinds of people and coordinate all kinds of activity. This is what I'm worried about, to get into these micro-arguments as to whether the possession of a state car and whether the degree of contact and whether the amount of contact information and cell phone information is sensitive or not. I don't know why courts are deciding these questions. It's not our bailiwick. Well, Your Honor, I see that my time has expired, but I'm happy to answer your question if I may. All right. Thank you very much, sir. All right. Thank you. May it please the court. This court is welcome to disagree with the Eighth Circuit. Eighth Circuit precedent does not bind this court, and we think, to the extent the court would like to, it should. But the court need not reach that issue, because we stressed qualified immunity to avoid line-drawing issues. This court need not become a minute balancer unless it chooses to dig into those issues. At bottom, my friend on the other side's argument shows that it wants this court to make the same mistake that the district court made, which is to get the qualified no case specifically approved of the exact testing used in the exact circumstances here that the testing was clear that it was its unconstitutionality was clearly established. That's not the test. Instead, undoubtedly, Garrett here had a plethora of conditions that established that the Department of Corrections had special needs to test him. On the other hand, Mr. Garrett consented as part of his employment. He alleges in his complaint, without looking at any other facts that may or may not be in the record, his complaint alone alleges that he had contact with inmates and access to network infrastructure that can be reasonably construed to involve access to sensitive information. Under the same precedents that he pointed to that are controlling precedents, that's enough for the Department of Corrections to believe that its testing policy was constitutional. And again, we don't just believe that it was constitutional. Our position is that it does not violate the Fourth Amendment. The method of testing, likewise, was as minimally invasive as possible. Rather than urinalysis or blood draws, which are the types of tests discussed throughout the precedent, the Department of Correction used a buccal swab for its tests. That's the most individualized suspicion test. It was randomized. Of a test without individualized suspicion, random testing is the most approved method. So for these reasons, we ask this court to reverse the district court's rulings and find that there was no Fourth Amendment violation, and certainly that if there was a Fourth Amendment violation, qualified immunity protects the individual defendants in this case. Thank you for your time. All right. Thank you. I want to thank Mr. Allen and Mr. Bryan. I want to thank you both for your arguments. We appreciate it. The good arguments and good briefing that you've given the court. So thank you so much.
judges: J. Harvie Wilkinson III, Julius N. Richardson, Allison J. Rushing